# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59710-1-II |
| Respondent, | |
| v. | |
| KIMCHA CHHIM, | PUBLISHED OPINION |
| Appellant. | |

LEE, J. — Kimcha Chhim appeals his convictions, after two separate trials, for first degree rape of a child of one victim and attempted first degree child molestation of another victim. Chhim argues the trial court erred by (1) denying his motion to proceed as a self-represented litigant before the charges were severed for trial and (2) denying his motion for a new trial based on jurors on the second trial seeing juror notes from the first trial.

We agree with both arguments. Therefore, we reverse Chhim's convictions and remand for new trials.[1]

---

[1] Chhim also challenges the imposition of community custody conditions that allegedly allow suspicionless searches of Chhim's home and prohibit his consumption of alcohol or marijuana. In a statement of additional grounds for review, RAP 10.10(a), Chhim raises various claims challenging his convictions. Because we reverse Chhim's convictions, we do not reach these additional issues and claims.

FACTS

Between 2020 and 2021, C.L.[2] and C.A. both disclosed that they were sexually abused when they were minors. Subsequent police investigations revealed that Chhim was the alleged abuser. In 2023, the State filed an amended information charging Chhim with two counts of first degree rape of a child and one count of first degree child molestation based on his alleged abuse of C.L. and C.A. The information alleged that between July 2011 and July 2013, Chhim raped C.L. on two separate occasions and that in July 2017, Chhim molested C.A.

Prior to trial, Chhim moved to sever the counts by victim, and the trial court granted his motion, reasoning that "it would be difficult for jurors to compartmentalize the allegations present in each incident . . . and the court has no confidence that evidence of one of these allegations would be admissible in a trial about the other allegation." Clerk's Papers (CP) at 64.

The severed trials were tried consecutively. Following the first trial on the two counts of first degree rape of a child involving C.L., the jury found Chhim guilty on one count and not guilty on the other. Following the second trial on the single count of first degree child molestation involving C.A., the jury found Chhim not guilty of first degree child molestation, but found him guilty on the lesser included offense of attempted first degree child molestation.

The evidence presented at trial relating to the disclosures and investigations that resulted in the child abuse allegations are as follows.

---

[2] We use initials to protect the victim's identity and privacy interests. *See* Gen. Order 2023-2 of Div. II, *Using Victim Initials* (Wash. Ct. App.), available at: https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2023-2&div=II.

No. 59710-1-II

A.      C.L.[3]

In 2012, when C.L. was six years old, she was "molested through oral sex" four times by a male whose name she could not remember. 1 Verbatim Rep. of Proc. (VRP) (Aug. 22, 2023) at 192. C.L. described her abuser as a neighbor who was "[o]lder, Asian, maybe Filipino, mid 30s, greyish blackish hair, goatee." 1 VRP (Aug. 22, 2023) at 194. The sexual abuse occurred "in his house," which C.L. described as "a yellow one-story house." 1 VRP (Aug. 22, 2023) at 194. C.L. said the man would offer her ice cream to lure her into his home and then perform oral sex on her on the couch. Specifically, the man "would use his tongue" on her "[b]are" vagina. 1 VRP (Aug. 22, 2023) at 197.

C.L. eventually disclosed the abuse to her therapist in 2020. Because C.L.'s therapist is a mandatory reporter, the therapist reported C.L.'s disclosure to child protective services.

Sergeant Teresa Antush investigated C.L.'s disclosure in November 2020. Sergeant Antush spoke with C.L. by phone the following month, at which time C.L. disclosed sexual abuse and described her abuser as a male with "wavy black hair to his shoulder, mustache and small goatee, probably Filipino. . . . Black glasses, 30 to 35 years old, and five-nine." 1 VRP (Aug. 22, 2023) at 164. During a forensic interview, C.L. made two disclosures of abuse and gave a physical description of her abuser that matched the description she gave Sergeant Antush.

As part of the investigation, Sergeant Antush visited C.L.'s old neighborhood, called C.L. over the phone, and had C.L. walk her from C.L.'s old house to her abuser's home. Following C.L.'s directions, Sergeant Antush located a house that matched C.L.'s description: "a yellow

---

[3] All facts in this section are drawn from testimony or other evidence elicited or admitted at Chhim's first trial.

3

house with a metal cyclone fence." 1 VRP (Aug. 22, 2023) at 168. The house was located at 2002 East 60th Street. Pierce County assessor records revealed the home was owned by Kimcha Chhim. When Sergeant Antush knocked on the door, there was no response and "[i]t was dark inside." 1 VRP (Aug. 22, 2023) at 169.

Sergeant Antush eventually contacted Chhim, and he agreed to speak with her and Detective Philip Hoschouer at Tacoma Police Department headquarters. During the police interview, Chhim acknowledged that he owned the home on East 60th Street and had lived there for some 20 years.

When officers showed Chhim a photograph of C.L., he recognized her "as one of the children of the neighborhood or from the neighborhood," but he could not recall her name. 1 VRP (Aug. 28, 2023) at 62. Chhim admitted he touched C.L. but maintained any contact occurred while the two played together and was neither violent nor sexual. Chhim also stated, "I did not hurt her, I did not penetrate." 1 VRP (Aug. 28, 2023) at 64. After Chhim was informed of the nature of the allegations against him, he denied performing oral sex on C.L.

B.      C.A.[4]

When C.A. was in elementary and middle school, she lived next door to a woman named Kyra Olson and her boyfriend, "KC." 5 VRP (Sep. 12, 2023) at 687. While C.A. did not know anyone by the name "Kimcha Chhim," she identified the defendant in court as the man she knew as "KC." 5 VRP (Sep. 12, 2023) at 687, 688.

---

[4] All facts in this section are drawn from testimony or other evidence elicited or admitted at Chhim's second trial.

4

In March 2017 or 2018,[5] on her 11th or 12th birthday, C.A.'s mother dropped C.A. off at Chhim's house for Olson to "babysit" or watch C.A. 5 VRP (Sep. 12, 2023) at 690. C.A., Chhim, and Olson were the only people in the house at the time. At some point that evening, Olson left "to pick something up," leaving C.A. alone with Chhim. 5 VRP (Sep. 12, 2023) at 691. While Olson was away, Chhim began "making comments like [C.A.] was so young and fresh and pretty and stuff like that." 5 VRP (Sep. 12, 2023) at 692. Chhim then sat on the bed next to C.A., pushed C.A. back, and used his hand to rub C.A.'s vagina over her clothing.

When Chhim stopped rubbing C.A., she was able to get up and exit the bedroom. C.A. eventually managed to get the front door unlocked, opened the door, and fled the residence. Because C.A. did not have her cellphone, she ran to a neighbor's house and asked if she could call her mother. The neighbor called the police instead.

When police arrived, C.A. told them nothing happened, that Chhim was "weirding" her out, and she needed help retrieving her belongings from Chhim's house. 5 VRP (Sep. 12, 2023) at 706. C.A. did not tell the police what happened with Chhim because she did not "want to go through all of this" and would rather "pretend it didn't happen." 5 VRP (Sep. 12, 2023) at 701.

One of the responding officers testified that he was dispatched in July 2017 to perform a welfare check on a 12 or 13 year old female "who was crying on a neighbor's porch." 4 VRP (Sep. 11, 2023) at 664. The responding officers found C.A. in an emotional, frantic state, crying as if something was bothering her. C.A. told the officers that a man was "messing with her," that he "was weirding her out" and had attempted "to smell her." 4 VRP (Sep. 11, 2023) at 665, 666;

---

[5] Two responding officers testified that the following events occurred in July 2017.

5

5 VRP (Sep. 12, 2023) at 784. The man told C.A., "I'm glad that [Olson's] gone, she always tells your mom everything" and began fondling himself. 5 VRP (Sep. 12, 2023) at 784.

C.A. requested assistance in retrieving her belongings from the man's house. The officers escorted C.A. to a residence at 2002 East 60th Street. A male opened the door and identified himself as "Mr. Chhim." 4 VRP (Sep. 11, 2023) at 667. The person who answered the door was "Kimcha Chhim." 5 VRP (Sep. 12, 2023) at 788.

While one officer and C.A. gathered C.A.'s belongings, the other officer asked Chhim if something happened with C.A., and Chhim said "that nothing had occurred, nothing out of normal had occurred." 5 VRP (Sep. 12, 2023) at 790. Chhim told the officer that C.A. had told Chhim she was going to find Olson, then left the house, and that Chhim did not expect her to return. Chhim also denied any inappropriate contact with C.A.

Police did not follow up with C.A. about the incident until 2021. In January 2021, Sergeant Antush was investigating Chhim when she learned of C.A.'s 2017 contact with Chhim.[6] Sergeant Antush and Detective Hoschouer interviewed C.A., and C.A. disclosed that Chhim sexually abused her at his home.

---

[6] Police presumably followed-up with C.A. after C.L. disclosed in 2021 that Chhim had sexually abused her. During motions in limine prior to Chhim's second trial (involving the abuse of C.A.), the State sought to introduce evidence pursuant to ER 404(b) that Chhim had been convicted of raping C.L. The State explained to the trial court that it was not until C.L. disclosed abuse in 2021 that "investigators even found the report with regard to [C.A.]" and followed up with her. 3 VRP (Sep. 6, 2023) at 308. It appears that because the trial court excluded any mention of Chhim sexually abusing C.L. during the trial on Chhim's sexual abuse of C.A., Sergeant Antush did not explain why she was investigating Chhim in 2021 or how that investigation connected to C.A.'s 2017 report.

After speaking with C.A., Sergeant Antush and Detective Hoschouer contacted Chhim. Chhim agreed to speak with the officers, and they escorted him to Tacoma Police Department headquarters. Once they arrived, Chhim declined to have his interview recorded. During the interview, Chhim acknowledged that he owned a home at 2002 East 60th Street, but he was staying with his sister to help her remodel her home.

In 2023, the Pierce County Prosecutor's Office asked police to follow-up with C.A. again. Detective Hoschouer and Sergeant Antush interviewed C.A., and she disclosed that Chhim sexually abused her. C.A. testified that when the police interviewed her in 2023, she told them "everything" that happened in 2017. 5 VRP (Sep. 12, 2023) at 704.

The State subsequently charged Chhim with two counts first degree rape of a child (C.L.) and one count of first degree child molestation (C.A.).

## C.     MOTION TO PROCEED AS SELF-REPRESENTED LITIGANT

### 1.     Initial Colloquy and State's Objection

Before trial, Chhim filed a motion to proceed as a self-represented litigant. At a hearing on Chhim's motion, the trial court engaged in the following colloquy with Chhim:

> THE COURT: Okay. Mr. Chhim, what are you asking the Court to do today?
> THE DEFENDANT: I want to represent myself. I want to be attorney for myself.
> THE COURT: You are charged with rape of a child in the first degree, two counts.
> [Prosecutor], what is the possible sentence that we're facing here?
> [STATE]: Life on both counts.
> THE COURT: Mr. Chhim, do you understand the—
> THE DEFENDANT: I understood, Your Honor.
> THE COURT: Okay. I'm going to finish my question because I'm making a record. Do you understand what you've been charged with?
> THE DEFENDANT: I understood.

7

THE COURT: And do you understand what the consequences are if those charges are proven at trial?

THE DEFENDANT: I understood; I do.

THE COURT: Okay. I must advise you that in my opinion, you would be far better defended by a licensed and trained lawyer. I think it is very unwise of you to try to represent yourself, especially with such serious and potentially catastrophic consequences in play. I'm going to ask you a series of questions in colloquy in order to assist the Court in making a decision as to whether your motion should be granted and whether you are making this decision unequivocally, willingly, and voluntarily. The law requires me to make a record that you are fully aware of the hazards that you face and the disadvantage of self-representation if you choose to waive counsel and proceed as a self-represented litigant.

Mr. Chhim, have you ever studied the law?

THE DEFENDANT: No, I never.

THE COURT: Have you ever represented yourself or any other defendant in a criminal action?

THE DEFENDANT: No, I did not.

THE COURT: We've already discussed the crimes you're charged with, although allegations at this point. You have acknowledged to me that you understand the consequences could be severe if you are found guilty at trial?

THE DEFENDANT: I understood, Your Honor.

THE COURT: Do you understand, Mr. Chhim, that if you choose to represent yourself, you are completely on your own?

THE DEFENDANT: I understood.

THE COURT: The judge who tries your case cannot tell you how to do so or give you any advice. Are you familiar with the rules of evidence, Mr. Chhim?

THE DEFENDANT: I understood. I read a lot of books.

THE COURT: Okay. Are you familiar with the federal rules of evidence?

THE DEFENDANT: I understood.

THE COURT: Okay. I want you to listen to my question again: Are you familiar with either the federal or state rules of evidence?

THE DEFENDANT: Yes, I—I knew.

THE COURT: Do you realize, Mr. Chhim, that the rules of evidence govern what evidence may or may not be introduced at trial; and in representing yourself, you must abide by those rules?

THE DEFENDANT: Yes, I understood.

THE COURT: Are you familiar with the rules of criminal procedure?

THE DEFENDANT: I—I know some.

THE COURT: Do you acknowledge that those rules govern the way in which a criminal trial is conducted?

THE DEFENDANT: Yes, I understood some.

THE COURT: Do you realize, Mr. Chhim, that if you take the witness stand, you will be required to present your testimony in a question-and-answer format by asking questions of yourself?

THE DEFENDANT: Understood.

THE COURT: You will not be able to take the stand and tell a story in a narrative fashion?

THE DEFENDANT: I understood.

THE COURT: Mr. Chhim, please tell me in your own words why you do not want an attorney.

THE DEFENDANT: This is a very hard case, and no one can take responsibility to give me justice, even the law enforcement. The only reason can—can represent myself—can be attorney for myself.

THE COURT: I must again advise you, Mr. Chhim, that I think this is extremely unwise given the consequences. Based upon what you've told me so far, you are not familiar with the law, the rules—the rules of evidence or criminal procedure. I strongly urge you not to try to represent yourself. I must ask you, at this time, if any threats or promises have been made to induce you to give up counsel?

THE DEFENDANT: I understood. I—I—I understood the constitution of this. I can be responsible for my conduct.

THE COURT: Mr. Chhim, in light of the penalty that you might suffer if you're found guilty at trial and in light of all the difficulties in representing yourself, not the least of which is the fact that you are using an interpreter in an English-speaking courtroom—criminal courtroom; and for the record, we're here, again, with a Cambodian interpreter.

Given all of those issues, is it still your desire to represent yourself and give up counsel?

THE DEFENDANT: Yeah, I'm—I'm—I'm clear. There's no other time than—clearer than this time. I'm clear that I can represent myself.

THE COURT: Is your decision voluntary?

THE DEFENDANT: Yes, I—I do it voluntarily.

THE COURT: Although the defendant has been warned by the Court of the Court's perception that the decision to proceed without counsel is extremely unwise and could result in catastrophic consequences, I find the defendant has knowingly and voluntarily waived the right to counsel.

Mr. Chhim, are you familiar with the term "standby counsel"?

THE DEFENDANT: Yeah, I—I—I understood; that's why I want a Cambodian interpreter also.

THE COURT: Mr. Chhim, the question I'm asking you is: Are you familiar with the phrase or term "standby counsel"?

THE DEFENDANT: Yes.

THE COURT: Okay. Are you asking the Court to appoint standby counsel?

9

THE DEFENDANT: Yes, and that's why I want a Cambodian interpreter also.

THE COURT: The interpreter has nothing to do with the question I'm asking right now.

THE DEFENDANT: Yeah, I—I understood that the—the constitution in the free world provides the standby counsel.

THE COURT: Okay. And that's incorrect. You have no right to standby counsel; that is a discretionary decision that the Court makes.

THE DEFENDANT: Yes, I request for a standby counsel.

THE COURT: So I want to—I want to explain that standby counsel does not mean hybrid counsel. If I appoint standby counsel, they do not serve as co-counsel with you. They are in the background for you to confer with but you are responsible solely for your representation. The right to proceed pro se and the right to assistance of counsel are mutually exclusive, so standby counsel, which can provide some limited assistance, is not a safety net.

I'm going to admonish you one more time that I think this is a very wise [sic]—unwise[.]

. . . .

THE DEFENDANT: I understood, Your Honor.

VRP (Nov. 10, 2022) at 6-12.

The State interjected and "strongly urge[d] the Court to reconsider [its] ruling." VRP (Nov. 10, 2022) at 12. The trial court responded, "I'm looking at the law. Tell me what you think is going to give . . . me the right to not let him proceed pro se." VRP (Nov. 10, 2022) at 12. The State said the trial court must ensure Chhim "has a general understanding of the consequences that he faces" and argued that Chhim was "unable to answer basic questions" regarding standby counsel. VRP (Nov. 10, 2022) at 12. The trial court added that the issue was "complicated by the fact that we have an interpreter; and I have to believe that I'm being told truthfully and unequivocally what [Chhim's] desires are." VRP (Nov. 10, 2022) at 13.

The trial court then noted that Chhim representing himself was not what the trial court would "prefer" and asked Chhim if he would reconsider his motion. VRP (Nov. 10, 2022) at 13.

No. 59710-1-II

Chhim responded, "I've been thinking a lot; this is an 11-year-old case." VRP (Nov. 10, 2022) at 13. The trial court responded, "I'm going to take this under advisement" and requested briefing from the State. VRP (Nov. 10, 2022) at 13.

    2.      Letter from Chhim

Before the parties and trial court reconvened, the trial court received the following letter from Chhim:[7]

> As of today my attorney has done all she could on my case. Your honor, I am writing or should I say praying to you for help. Your honor, I know under a United States Supreme Court ruling . . . that all defendants on trial have a constitutional right to have an assistance of not just counsel, but an assistance of effective counsel.
>
> . . . .
>
> Your Honor, I have been reading law books and it has showed me that I have a constitutional right to have all state's witness and the victim in my case attend [indecipherable]. . . .
>
> At this time, your honor, I am asking for a new counsel that will work effectively on my case.
>
> I do have the right to be represented by counsel of my own choice. . . .
>
> Your honor, I pray to you for help to appoint to me effective counsel that will file very important pre-trial motions into the court on my behalf. Thank you, your honor, for your time, understanding and consideration.

CP at 311-13.

---

[7] The letter is dated November 5, 2022, days before the trial court addressed Chhim's motion to proceed as a self-represented litigant. However, the letter was not received by the Pierce County Jail until November 9, and the trial court did not receive it until November 17. The letter was filed with the trial court on November 18, the day of the second hearing on Chhim's motion to proceed as a self-represented litigant.

3.    Additional Arguments

When the parties reconvened, one of Chhim's interpreters informed the trial court that they were unsure whether Chhim wanted their services. Chhim informed the trial court that he wanted "the interpreter to stand by," and the trial court informed Chhim that he would "either be using an interpreter or not using an interpreter; we cannot do a hybrid." VRP (Nov. 18, 2022) at 6. Chhim responded, "He may be excused." VRP (Nov. 18, 2022) at 6. The State suggested that the trial court engage in a colloquy with Chhim to ensure he understood what he was giving up. Defense counsel suggested they keep the interpreter. The trial court agreed and decided it would proceed with an interpreter because Chhim had historically used an interpreter.

The State then addressed Chhim's letter, stating that in the letter, Chhim "seemingly requests that there be a substitution of counsel rather than a waiver of the right to counsel in its entirety." VRP (Nov. 18, 2022) at 9. The trial court engaged in the following colloquy with Chhim:

> THE COURT: Okay. The last time that this was in front of me one week ago, Mr. Chhim was seeking to proceed as a pro se or self-represented litigant. . . .
> Yesterday, . . . we received a letter from Mr. Chhim . . . that appears to be asking for something entirely different. This letter seemingly requests that there be a substitution of counsel rather than a waiver of the right to counsel in its entirety.
> So, Mr. Chhim, you have presented conflicting requests; and I do need you to tell the Court, unequivocally, what it is that you're seeking.
> THE DEFENDANT: I'm asking the Court to allow me to represent myself. I—but I also want to have an interpreter.
> THE COURT: You will have an interpreter.
> THE DEFENDANT: Thank you, Your Honor. The charge is very severe, and I want to represent myself.
> THE COURT: Your letter states: "At this time, Your Honor, I'm asking for new counsel that will work effectively on my case."
> THE DEFENDANT: Nobody can be responsible—can work more effectively than I am.
> THE COURT: Are you withdrawing the request for new counsel?

12

> THE DEFENDANT: I'm asking to have a new attorney; the new attorney is me. I—I want to withdraw my letter, Your Honor, my request.
> THE COURT: Thank you. The letter is being filed in LINX, but Mr. Chhim has now indicated on the record he's not seeking new counsel. He continues to request that he be allowed to represent himself.
> THE DEFENDANT: Thank you, Your Honor.
> THE COURT: Mr. Chhim, do you have a copy of the memorandum of law filed by the State?
> THE DEFENDANT: Yes, Your Honor. Yes. I have it in front of me, yes.
> THE COURT: Have you been able to review that with the assistance of the interpreter?
> THE DEFENDANT: I read the document already, Your Honor, but the—this is the—the same thing, nothing new to me.
> THE COURT: The answer, sir, that I'm seeking is "yes" or "no."
> THE DEFENDANT: Yes.

VRP (Nov. 18, 2022) at 9-10.

The State argued that the trial court should deny Chhim's motion to proceed as a self-represented litigant because his waiver was not knowing and intelligent: "With every colloquy the Court has engaged with the defendant, he has expressed much confusion, fails to answer basic questions." VRP (Nov. 18, 2022) at 12. Defense counsel responded that the State had "no standing to object" to Chhim's motion to proceed as a self-represented litigant because "[w]hether or not the State approves is not something the Court can consider." VRP (Nov. 18, 2022) at 13.

The trial court suggested it would deny Chhim's motion, reasoning that Chhim "has not been able to make an unequivocal request to proceed pro se," referencing his letter requesting substitute counsel as evidence of Chhim's equivocal request. VRP (Nov. 18, 2022) at 14. The trial court also found that Chhim's waiver of his right to counsel was not "knowing, voluntary, and intelligent" because Chhim's "answers . . . are not coherent." VRP (Nov. 18, 2022) at 14, 15.

The trial court then asked Chhim if he had anything to add, and Chhim reiterated that he had a constitutional right to represent himself and that he was "entitled to be [his] own attorney."

13

VRP (Nov. 18, 2022) at 15. Defense counsel then conferred with Chhim and informed the trial court that despite the confusion caused by Chhim's letter, "he wants to make sure the record is clear that he filed this information because he wanted to have . . . himself as new counsel, not because he wanted a new attorney." VRP (Nov. 18, 2022) at 16. The trial court was not persuaded by defense counsel's clarification and stated:

> The letter from Mr. Chhim . . . is further proof to me that Mr. Chhim does not have an understanding of legal—or criminal procedure. This letter, which is written in such a manner as to request new counsel, cannot be interpreted as Mr. Chhim wanting to be the new counsel; that's not the way the letter is written. That may have been his intent but it further—is further evidence, as far as this Court is concerned, of his lack of understanding of the rules, of the legalese. It is evidence of his inability to give me an unequivocal position. His statements and argument about having an interpreter . . . are, likewise, confusing.
> I have told Mr. Chhim on the record at least three times at the prior hearing, and I will tell him again today, I strongly advise him against pursuing self-representation. I do not believe he understands what is required or what he is doing or the consequences of not being able to conduct a trial using the rules of evidence and criminal procedure.

VRP (Nov. 18, 2022) at 16-17.

Defense counsel then clarified that the standard for proceeding pro se "is not that he has the same knowledge as an attorney." VRP (Nov. 18, 2022) at 17. The trial court responded that it was "aware of that" but maintained that "[t]his is an impossible situation here with the mental health issues in the background,[8] the language barrier, the inability to tell me unequivocally what

---

[8] Before Chhim moved to proceed as a self-represented litigant, the trial court ordered that Chhim undergo a competency evaluation based on defense counsel's "good faith belief that as a result of a mental disease or defect, the defendant may lack the capacity to understand the proceedings against him . . . or to assist in his . . . own defense." CP at 5. Chhim "refused to participate [in the evaluation] and left before it was completed." VRP (Sep. 15, 2022) at 6. Chhim was taken into custody and held without bail until a new competency evaluation could be completed.

he's wanting to do." VRP (Nov. 18, 2022) at 17. The trial court again took the matter under advisement.

### 4. Trial Court Denies Chhim's Motion

The trial court ultimately denied Chhim's motion to proceed as a self-represented litigant. In its written order, the trial court explained its reasoning as follows:

> After considering all of the information before the Court, engaging in a detailed colloquy on the record with the Defendant (with the assistance of a Cambodian interpreter) concerning the *Hampton*[9] factors (184 Wn.[2d] (2015)), observing Defendant in open court, listening to Defendant in open court, and reading Defendant's letter[] to the Court . . . the Court finds that Defendant fails to exhibit competency to represent himself in this matter.
> The Court further finds that Defendant fails to unequivocally maintain his request to waive counsel; fails to unequivocally maintain his request for an interpreter; fails to demonstrate an understanding of the seriousness of the charges in this matter (two counts of Rape of a Child in the 1st Degree); fails to demonstrate an understanding of legal procedure and fails to comprehend the potential consequences of a guilty verdict although it was explained to him, including a discussion of potential length of incarceration.
> Although Defendant has repeatedly stated that no one can represent him as well as he can represent himself, there is no legitimate cause for dissatisfaction with Defendant's assigned counsel.
> The Court further finds that Defendant, if allowed to waive counsel and proceed Pro Se, will disrupt and delay trial proceedings in this serious matter involving a child victim.
> The Court does not find that Defendant's request to waive counsel is knowing, intelligent or voluntary.

---

A new competency evaluation was completed, and while the evaluation is not in the record on appeal, the State represented to the trial court that the evaluator found Chhim "currently possesses the capacity to understand the nature of these proceedings as well as the capacity to assist in his own defense," and the trial court acknowledged that the evaluator found Chhim competent and that the evaluation "indicates that Mr. Chhim does not have a documented history of functional impairment related to substance use, and he does not appear to warrant a psychiatric diagnosis at this time." VRP (Oct. 12, 2022) at 6, 9. The trial court entered written findings of fact and conclusions of law supporting the determination that Chhim was competent to stand trial.

9  184 Wn.2d 656, 361 P.3d 734 (2015), *cert. denied*, 578 U.S. 948 (2016).

CP at 29-30.

D.     MOTION TO SEVER

Following the trial court's denial of Chhim's motion to proceed as a self-represented litigant, Chhim moved to sever the charge of first degree child molestation involving C.A. from the two first degree child rape charges involving C.L. The trial court granted Chhim's motion, reasoning that "it would be difficult for jurors to compartmentalize the allegations present in each incident, . . . and the court has no confidence that evidence of one of these allegations would be admissible in a trial about the other allegation." CP at 64.

Chhim's severed cases proceed to back-to-back jury trials in August and September 2023. The first trial addressed the child rape charges involving C.L., while the second trial addressed the child molestation charge involving C.A.

E.     FIRST TRIAL: C.L.

Prior to trial on the two first degree rape of a child charges involving C.L., Chhim moved to exclude evidence regarding his alleged abuse of C.A., arguing that it would constitute improper character evidence under ER 404(b). The trial court granted the motion and excluded the evidence.

C.L., the investigating officers, and C.L.'s therapist all testified consistent with the facts outlined above. Chhim did not testify.

Following deliberations, the jury found Chhim guilty on one count of first degree rape of a child and not guilty on the second count of first degree rape of a child.

F.      SECOND TRIAL: C.A.

1.      Motions in Limine

The day after Chhim's first trial ended, the trial court began hearing motions in limine for Chhim's second trial on the first degree child molestation charge involving C.A. Relevant here, the State moved to admit evidence of Chhim's conviction on first degree child rape under ER 404(b). The State argued that Chhim's conviction was admissible under the res gestae doctrine, as evidence of a common scheme or plan, to demonstrate the absence of mistake or accident, or as evidence of Chhim's intent to sexually gratify himself. Chhim responded that the evidence was improper propensity evidence and was not admissible for any of the purposes cited by the State.

The trial court agreed with Chhim and precluded the State from introducing evidence that Chhim had previously been convicted of raping C.L. The trial court reasoned that allowing such evidence would "undermine" the previous judge's severance ruling because "he was not persuaded that the jury could hear one alleged abuse incident and not immediately presume that if this occurred then this must have occurred." 3 VRP (Sep. 6, 2023) at 314. "[U]ltimately, I do think that allowing this type of evidence is going to be overly prejudicial to Mr. Chhim." 3 VRP (Sep. 6, 2023) at 314-15.

2.      Trial

C.A. and the investigating officers all testified consistent with the facts above. Chhim did not testify.

Before the jury returned its verdict, the following events forming the basis for Chhim's jury misconduct argument occurred.

17

G.     ALLEGED JUROR MISCONDUCT DURING SECOND TRIAL

    1.     Extrinsic Evidence in Jury Room

The jury began deliberating on September 13. Shortly after the trial court sent the jury out to deliberate, "Juror Number 3" discovered juror notes in the juror clipboard that were not their notes. There is no dispute that the juror notes that Juror Number 3 found were juror notes from Chhim's *first* trial. Despite being made aware of this, the judicial assistant did not inform the trial judge. Instead, the jury was allowed to continue with their deliberations.

The following morning, the judicial assistant informed the trial judge that as the jury began deliberations the previous day, Juror Number 3 found juror notes from the first trial. The trial judge summoned the parties and informed them of the following:

> So an issue was brought to my attention first thing this morning that we need to discuss. Yesterday, I believe it was after lunch, Juror Number 3 notified [the judicial assistant,] that there were some notes attached to his clipboard. And he said—he volunteered, I didn't read them but they're not my notes. And so he gave them to [the judicial assistant]. [The judicial assistant] checked with the other jurors just, this isn't your handwriting, these aren't your notes, right? No, they weren't anyone's notes. She brought them back to her desk, I think she folded them, put them on her desk and then finished the work for the day.
>
>     At the end of the day, she opened the notes just to look at them. They were notes from the first trial. So one of the jurors from the first trial—yeah, I don't know which one but it was notes from the first trial. I looked at them this morning, I'm going to show you both, I have them here marked as Exhibit Number 28 which would be admitted and preserved. It has the first thing on the notes is [C.L.]. Now [C.L.], her name was not mentioned in this trial.

6 VRP (Sep. 14, 2023) at 848-49.

The judicial assistant gave their own explanation on the record:

> So I thought that when I moved us from 2C to here, 211, I had inadvertently put the wrong clipboard in the wrong seat. And so I was committed to thinking that that was in the wrong seat, it was supposed to be there. And I asked, is this your

handwriting? They said no. Is this your handwriting? No. Is this your handwriting? No. Is this your handwriting? No.

So by the time I got down, they didn't see anything other than the handwriting because it was like two or three seconds; is this your handwriting? No. So I took them and I left.

6 VRP (Sep. 14, 2023) at 850-51.

As noted above, there is no dispute that the five pages of juror notes found by Juror Number 3 in the second trial involving C.A. were from Chhim's first trial involving C.L. Information in the notes include:

[C.L.]—victim (14y/o)         Birth: 2006, July 9th
         Sexually assalted [sic]

. . . .

Detectives—Antish & Hawtower

Khimsha Khim [sic]—(40 at time) from Cambodia

         [C.L.] told school counselor about being orally abused.

. . . .

Dec. 3—Spoke to [C.L.] via phone where she gave a description of the abuser wavy
         black hair, male goatee, 30-35 y/o

. . . .

         "Down the street" from [C.L.'s] previous address. . . . Based on victim's
description 2002 E 60th Street Tacoma—within block of victim's house.

. . . .

Defendant was born in 1972.

Victim said incident occurred 8 years prior when she was either in Kindergarten or
1st grade.

. . . .

19

[C.L.]—12th grade/works at Wild Waves
Molested 4 times orally when 6 y/o

. . . .

Suspect lived 3 houses down. 1 story house Yellow.

Ex. 28, at 1-3.[10]

### 2. Juror Number 3 and Verdict

Before the trial court could proceed with the questioning of any juror, the judicial assistant informed the court that the jury had reached a verdict. The trial court decided to question Juror Number 3 about the juror notes from the first trial before taking the jury's verdict.

In response to questions from the trial court and the parties, Juror Number 3 stated that they discovered the juror notes from the first trial were "mixed in" with their own notes before the jury began deliberating. 6 VRP (Sep. 14, 2023) at 852. Juror Number 3 notified the judicial assistant within "[p]robably five minutes or so" after discovering the juror notes. 6 VRP (Sep. 14, 2023) at 853.

After discovering the juror notes from the first trial, Juror Number 3 told everyone they found the juror notes and asked if it was "anybody's handwriting?" 6 VRP (Sep. 14, 2023) at 856. Juror Number 3 claimed no one read the contents of the juror notes "because we knew it was pertaining to probably a different case or something like that." 6 VRP (Sep. 14, 2023) at 853. Juror Number 3 admitted to reading the address in the juror notes and that the juror notes had the same address on it as in the second trial. Juror Number 3 showed the notes to Juror Number 4.

---

[10] Exhibit 28 does not contain page numbers. For the purposes of this opinion, we number the pages one through five starting from the first page of the exhibit.

Juror Number 3 recalled that someone in the room "said like, oh, I think this is a different case, a witness list or something. They saw a name on there." 6 VRP (Sep. 14, 2023) at 855. Finally, Juror Number 3 stated that the notes did not "sway" them in deciding the case. 6 VRP (Sep. 14, 2023) at 853.

After Juror Number 3 was questioned, the jury verdict was read in open court. The jury found Chhim not guilty on the first degree child molestation charge, but the jury found Chhim guilty of the lesser included offense of attempted first degree child molestation.

After the jury verdict was announced, the trial court allowed the parties to question the remaining jurors about the juror notes from the first trial. Notably, one of the jurors informed the trial court that after the judicial assistant got the notes from Juror Number 3, the judicial assistant asked each juror to check if the juror notes were theirs and "passed [the juror notes] around" "[f]rom hand to hand" so that each juror could verify whether the juror notes were theirs or not. 6 VRP (Sep. 14, 2023) at 890.

3. Individual Questioning

After receiving the verdict, the trial court allowed each party to question the remaining jurors individually.[11] The following responses were elicited by counsels' questions.

Juror Number 1 stated that they were made aware of the juror notes but did not look at them. Juror Number 1 also stated that the jury discussed "[j]ust the address" on the notes and speculated that they may have belonged to one of the alternate jurors. 6 VRP (Sep. 14, 2023) at

---

[11] The trial court did not ask any questions, stating, "I'm going to leave it to you all to ask the questions." 6 VRP (Sep. 14, 2023) at 862.

863. Juror Number 1 recalled that Juror Number 3 told the jury that the address on the juror notes was "the same address." 6 VRP (Sep. 14, 2023) at 863.

Juror Number 2 stated that they were made aware of the juror notes and "just kind of glanced over" at them but did not read them because they were not in Juror Number 2's handwriting. 6 VRP (Sep. 14, 2023) at 865. Juror Number 2 also stated that the contents of the juror notes were not discussed further during deliberations, but also stated that "Juror Number 3 thought that the address was the same" and said as much "aloud to the table." 6 VRP (Sep. 14, 2023) at 866-67. Juror Number 2 shared that there was some "theorizing" that the juror notes could have belonged to the alternate jurors that were released. 6 VRP (Sep. 14, 2023) at 867. Juror Number 2 further stated the juror notes did not affect their deliberations.

Juror Number 4 was not in the jury room when the juror notes were discussed and thus was not aware of the notes nor shown the notes.

Juror Number 5 was made aware of the juror notes when Juror Number 3 discovered them. Juror Number 5 could not recall how many jurors looked at the juror notes. Juror Number 5 did not read the notes because they could tell they were not written in Juror Number 5's handwriting. Juror Number 5 recalled that another juror speculated that the notes were "from a different case." 6 VRP (Sep. 14, 2023) at 870. Juror Number 5 stated the notes did not affect their deliberations.

Juror Number 6 was made aware of the juror notes when Juror Number 3 stated they found notes that were not theirs. Juror Number 6 saw the notes but "could not read anything else." 6 VRP (Sep. 14, 2023) at 872. Juror Number 6 stated the jury did not discuss the contents of the notes but also that Juror Number 3 "saw a few of the first words" and "thought it related to this trial." 6 VRP (Sep. 14, 2023) at 874. "I think [Juror Number 3] mentioned something about a

22

date. [Juror Number 3] saw a date on the notes and . . . it was strange to [them] that the dates were either similar or something to that matter with the dates related to this trial." 6 VRP (Sep. 14, 2023) at 874. Juror Number 6 stated the juror notes did not affect their deliberations.

Juror Number 7 did not learn about the juror notes until the next morning after they were found. Juror Number 7 recalled that Juror Number 3 "just said that there was notes that [they] saw wasn't in [their] writing." 6 VRP (Sep. 14, 2023) at 876. Juror Number 3 mentioned the address on the notes but did not expand on if it meant anything to them. Juror Number 7 did not look at the notes.

Juror Number 8 was made aware of the juror notes the afternoon before when Juror Number 3 announced they found them. Juror Number 8 did not look at the notes because they had their own notes in front of them. Juror Number 3 mentioned that the address in the notes "could have been the same address for this case we're involved in now." 6 VRP (Sep. 14, 2023) at 879. Juror Number 8 stated the notes were discussed for "a minute; maybe less than[] two minutes," and that they did not affect Juror Number 8's deliberations. 6 VRP (Sep. 14, 2023) at 879.

Juror Number 9 was made aware of the juror notes but did not look at them. Juror Number 9 recalled that Juror Number 3 "did not mention anything about the contents. I overheard a comment about the address written at the top being the same as one of the addresses mentioned during the proceedings." 6 VRP (Sep. 14, 2023) at 881. After the notes were given to the judicial assistant, there was "some speculation about where did [they] come from," with one juror saying "something about, like, if this was like maybe a second go around or something." 6 VRP (Sep. 14, 2023) at 881. Juror Number 9 stated the notes did not affect their deliberations.

Juror Number 10 was made aware of the juror notes when Juror Number 3 asked the jury whether the notes belonged to anyone. Juror Number 10 "did see the notes only to see if it was [their] handwriting and it wasn't." 6 VRP (Sep. 14, 2023) at 884. The jury "discuss[ed] where they might have come from" and that "the numbers were similar." 6 VRP (Sep. 14, 2023) at 884, 886. The jury speculated that the notes might have belonged to one of the alternate jurors or were from "another trial." 6 VRP (Sep. 14, 2023) at 885. Juror Number 10 also recalled that Juror Number 3 mentioned "seeing a 2-2 . . . and thinking maybe it might have been a mistrial, but [they] didn't read further. . . . [They] didn't elaborate on that." 6 VRP (Sep. 14, 2023) at 885. Juror Number 10 stated the notes did not affect their deliberations.

Juror Number 11 was made aware of the juror notes the day before when Juror Number 3 found them. Juror Number 11 saw the notes and read them "[o]nly in the course of checking if it was my handwriting." 6 VRP (Sep. 14, 2023) at 887. Juror Number 11 specifically recalled making out the word "'victim'" in the notes. 6 VRP (Sep. 14, 2023) at 887. The contents of the notes were "mostly" not discussed, but Juror Number 3 did state "that [they] had recognized the address" as an address that had been mentioned at trial. 6 VRP (Sep. 14, 2023) at 889. Juror Number 11 stated the notes did not affect their deliberations.

Finally, Juror Number 12 was made aware of the juror notes when Juror Number 3 found them. 6 VRP (Sep. 14, 2023) at 891. Juror Number 12 had their notes but speculated that "maybe it was from another—another case or something." 6 VRP (Sep. 14, 2023) at 891. Juror Number 12 stated that the notes did not affect their deliberations.

4.      Motion for New Trial

Following individual questioning of each juror, Chhim moved for a mistrial, arguing juror misconduct. The trial court stated that based on the varying accounts of what happened, "none of us really can be truly clear about what happened because we got 12 different stories essentially in variations." 6 VRP (Sep. 14, 2023) at 896.

The State argued that a mistrial was not the proper remedy, "but rather a motion that must be made through other criminal rules" such as CrR 7.4, 7.5, 7.8, or 8.3. 6 VRP (Sep. 14, 2023) at 897. The State then requested time to brief the issue, defense counsel concurred, and the trial court recessed so the parties could brief the issue.

Chhim filed a CrR 7.5 motion for new trial, arguing that the juror notes from the first trial were so prejudicial that only a new trial for the charge involving C.A. could ensure that Chhim was tried fairly. Chhim contended that the applicable standard was objective, asking whether the extrinsic information could have affected the jury's verdict, not whether it actually did. Chhim also argued that a mistrial or a new trial was warranted under CrR 7.5(a)(1) ("Receipt by the jury of any evidence, paper, document or book not allowed by the court"), (a)(2) ("Misconduct of the prosecution or jury"), or (a)(5) ("Irregularity in the proceedings of the court, jury or prosecution, or any order of court, or abuse of discretion, by which the defendant was prevented from having a fair trial"). CP at 254.

The State responded by arguing that the trial court should deny Chhim's motion because Chhim could not show prejudice. The State contended that because "none of the jurors saw any prejudicial portion of the notes or took them into consideration during deliberation," there was no prejudice. CP at 244. The State also contended that Chhim "cannot demonstrate prejudice where

25

the record shows the jurors were not aware of his first trial, charges, or conviction because of the notes. While the jurors speculated about the origins of the notes, they did not indicate that they knew or believed the notes stemmed from his other charges or conviction." CP at 245.

At a hearing on the motion, Chhim argued that because the jury returned its verdict before the discovery of extrinsic evidence could be addressed, his argument was "premised on the fact that an objective observer . . . could infer that prejudice had occurred because all of the jurors had viewed the notes from the prior trial," the notes suggested this was Chhim's second trial, and the jury discussed that possibility. 1 VRP (Oct. 20, 2023) at 4.

The trial court denied Chhim's motion. The trial court explained that all 12 jurors denied discussing the notes during deliberations or factoring them into the verdict.

> There's no evidence that the jury considered the notes or was influenced at all by the notes, even though almost all the jurors stated that they may have briefly held onto the notes when passing them around or briefly glanced at the notes.

1 VRP (Oct. 20, 2023) at 14-15. Thus, according to the trial court, assuming the jury answered the trial court and parties' questions truthfully and otherwise followed the trial court's instructions, there was "not a sufficient showing . . . that the notes improperly influenced the jury or that the jury even read the notes and registered what exactly they were." 1 VRP (Oct. 20, 2023) at 15. The trial court entered a written order consistent with its oral ruling.

H.    SENTENCING

The trial court sentenced Chhim to an indeterminate sentence of 160 months to life on the first degree child rape conviction and to an indeterminate sentence of 65 months to life on the attempted first degree child molestation charge, to be served concurrently.

Chhim appeals.

26

ANALYSIS

A.    MOTION TO PROCEED AS SELF-REPRESENTED LITIGANT

Chhim asks this court to "reverse and remand both cases for new trials because the trial court violated Mr. Chhim's constitutional right to self-representation" when it "denied his timely, unequivocal requests to proceed pro se for an invalid reason." Br. of Appellant at 30. Specifically, Chhim contends the record does not support the trial court's finding that Chhim's request to proceed as a self-represented litigant was equivocal or that his waiver of his right to counsel was not knowing, intelligent, and voluntary. The State responds that even if the trial court erred in denying Chhim's motion to proceed as a self-represented litigant, Chhim abandoned his request by not renewing it before trial.

We hold that the trial court abused its discretion when it found Chhim's request was equivocal and that Chhim did not knowingly, intelligently, and voluntarily waive his right to counsel. We also reject the State's argument that Chhim abandoned his request to proceed as a self-represented litigant.

1.    Legal Principles

"Criminal defendants have an explicit right to self-representation under the Washington Constitution and an implicit right under the Sixth Amendment to the United States Constitution." *State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010). However, we make every reasonable presumption against a defendant's waiver of their right to counsel. *Id.*

Trial courts engage in a two-step process in determining whether to grant a defendant's motion to proceed as a self-represented litigant:

First, the court must determine whether the request for self-representation is timely and unequivocal. If the request . . . is untimely or equivocal, the defendant's right to counsel remains in place and the trial court must deny the request to proceed pro se. Second, if the request is timely and unequivocal, the court must then determine whether the request is also voluntary, knowing, and intelligent.

*State v. Curry*, 191 Wn.2d 475, 486, 423 P.3d 179 (2018) (citations omitted).

We review the trial court's decision on a motion to proceed as a self-represented litigant for an abuse of discretion. *Madsen*, 168 Wn.2d at 504. The trial court abuses its discretion when its decision "is manifestly unreasonable or 'rests on facts unsupported in the record or was reached by applying the wrong legal standard.'" *Id.* (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

2.      Equivocality

"The threshold issues of timeliness and equivocality focus on the nature of the request itself—if, when, and how the defendant made a request for self-representation—not on the motivation or purpose behind the request." *Curry*, 191 Wn.2d at 486-87. In determining whether a request for self-representation is unequivocal, the trial court asks two questions: "(1) Was a request made? If so, (2) was that request unequivocal?" *Id.* at 487. Such a determination depends on the specific facts and circumstances of the case. *Id.*

Here, the parties do not dispute that Chhim timely requested to proceed as a self-represented litigant. Rather, Chhim argues that his request was unequivocal, while the State maintains the trial court correctly found Chhim's request was equivocal.

In determining whether a request to proceed as a self-represented litigant was unequivocal, the trial court must "examine the nature of the request." *Id.* at 489. "Relevant considerations include whether the request was made as an alternative to other, preferable options and whether

the defendant's subsequent actions indicate the request was unequivocal," though neither factor is dispositive. *Id.* Ultimately, "an unequivocal request to proceed pro se requires a defendant to 'make an explicit choice between exercising the right to counsel and the right to self-representation so that a court may be reasonably certain that the defendant wishes to represent himself.'" *Id.* at 490 (quoting *United States v. Arlt*, 41 F.3d 516, 519 (9th Cir. 1994)).

Here, the trial court found that Chhim's request to proceed as a self-represented litigant was equivocal because he "fail[ed] to unequivocally maintain his request to waive counsel" and "fail[ed] to unequivocally maintain his request for an interpreter." CP at 30. The equivocality of Chhim's request for an interpreter has no bearing on whether his request to proceed as a self-represented litigant was equivocal or not. In determining whether a request for self-representation is unequivocal, the inquiry is focused "on the nature of the request itself—if, when, and how the defendant made a request *for self-representation*." *Curry*, 191 Wn.2d at 486-87 (emphasis added).

The State argues that Chhim's indecisiveness regarding his need for an interpreter demonstrates the equivocality of his request for self-representation. However, the State cites no authority allowing, let alone requiring, the trial court to consider anything but the request for self-representation in determining whether the request to proceed as a self-represented litigant is equivocal or not. "'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.'" *State v. Logan*, 102 Wn. App. 907, 911 n.1, 10 P.3d 504 (2000) (quoting *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).

Prior to the trial court's receipt of Chhim's letter requesting substitute counsel, Chhim unequivocally requested to represent himself: "I want to represent myself. I want to be attorney

for myself." VRP (Nov. 10, 2022) at 6. The trial court informed Chhim that he faced a potential life sentence and would be bound by court procedure and the rules of evidence. And the trial court advised Chhim that he would be better off with appointed counsel. But Chhim still sought to self-represent, telling the court that "Yeah, I'm—I'm—I'm clear. There's no other time than—clearer than this time. I'm clear that I can represent myself." VRP (Nov. 10, 2022) at 10. Chhim's responses to the trial court's inquiries and warnings about the consequences of self-representation demonstrate that Chhim made "'an explicit choice between exercising the right to counsel and the right to self-representation'" such that the trial court could be reasonably certain Chhim wished to represent himself. *Curry*, 191 Wn.2d at 490 (quoting *Arlt*, 41 F.3d at 519). And it appears the trial court was, at least initially, reasonably certain Chhim wished to represent himself. Specifically, when the State objected to allowing Chhim to proceed as a self-represented litigant, the trial court responded, "I have to believe that I'm being told truthfully and unequivocally what [Chhim's] desires are. This is not what I prefer; this is not what I want." VRP (Nov. 10, 2022) at 13.

However, after the trial court received Chhim's letter, the court expressed confusion as to whether Chhim was requesting substitute counsel or requesting to represent himself, and asked Chhim to state, "unequivocally, what it is you're seeking." VRP (Nov. 18, 2022) at 9. Chhim responded, "I'm asking the Court to allow me to represent myself." VRP (Nov. 18, 2022) at 9. He stated, "This charge is very severe, and I want to represent myself." VRP (Nov. 18, 2022) at 9. The trial court then asked whether Chhim was withdrawing his request for new counsel, and Chhim responded, "I'm asking to have a new attorney; the new attorney is me. I—I want to withdraw my letter, Your Honor, my request." VRP (Nov. 18, 2022) at 10. The trial court then

stated, "The letter is being filed in LINX, but Mr. Chhim has now indicated on the record he's not seeking new counsel. *He continues to request that he be allowed to represent himself*." VRP (Nov. 18, 2022) at 10 (emphasis added). Thus, it appears Chhim's explanation and request to withdraw the letter seeking substitute counsel ameliorated the trial court's confusion, and the trial court understood that Chhim wished to proceed as a self-represented litigant. *Curry*, 191 Wn.2d at 490.

Despite the trial court's statements showing that the trial court understood Chhim "continues to request that he be allowed to represent himself," the trial court made an oral finding that Chhim's request was equivocal: "I've got a letter in my hand asking for a change of counsel. The first step in the analysis . . . is whether the request is unequivocal. I cannot find that, hence, the Court's confusion this morning over what we were doing here." VRP (Nov. 18, 2022) at 10, 14. When asked to respond, Chhim stated he had a constitutional right to represent himself and was "entitled to be [his] own attorney." VRP (Nov. 18, 2022) at 15. Moreover, defense counsel informed the trial court that Chhim "wants to make sure the record is clear that he filed [his letter] because he wanted . . . himself as new counsel, not because he wanted a new attorney." VRP (Nov. 18, 2022) at 16. Despite Chhim's repeated requests to proceed as a self-represented litigant, and his and defense counsel's explanation of the letter, the trial court found that the letter "cannot be interpreted as Mr. Chhim wanting to be the new counsel; that's not the way the letter is written." VRP (Nov. 18, 2022) at 16.

In light of the record, the trial court abused its discretion when it found Chhim's request was equivocal. Chhim repeatedly requested to self-represent, both before and after the trial court received his letter requesting substitute counsel. Moreover, read in context, the letter and Chhim's

explanation of it demonstrate that Chhim never sought substitute counsel, but rather intended the letter to be a request to substitute *himself* as counsel. And even if the letter were a request for substitute counsel, Chhim withdrew the letter, and the trial court acknowledged that Chhim was continuing to request self-representation.

The trial court rested its finding of equivocality in part by "'applying the wrong legal standard'" when it relied on Chhim's equivocal request for an interpreter as evidence that his request to proceed as a self-represented litigant was equivocal. *Madsen*, 168 Wn.2d at 504 (quoting *Rohrich*, 149 Wn.2d at 654). Furthermore, the trial court's decision was unsupported by the record; the record clearly shows that Chhim repeatedly requested to proceed as a self-represented litigant. Accordingly, the trial court abused its discretion when found that Chhim's request to proceed as a self-represented litigant was unequivocal.

3.      Abandonment

The State argues that "even if the court erred" when it denied Chhim's motion to proceed as a self-represented litigant, "any error was rendered moot by Chhim's subsequent acquiescence to his counsel's assistance and his failure to renew his motion to proceed pro se at any time prior to trial." Br. of Resp't at 23-24. We disagree.

The State argues that "[e]ven when the right [to self-representation] is unequivocally asserted, 'it may still be subsequently waived by words or conduct.'" Br. of Resp't at 39 (quoting *State v. Fritz*, 21 Wn. App. 354, 360, 585 P.2d 173 (1978), *review denied*, 92 Wn.2d 1002 (1979)).[12] To support its argument that Chhim waived his request to proceed as a self-represented

---

[12] Despite announcing the general legal principle that an unequivocal assertion of the right to self-respresent can be waived by words or conduct, *Fritz* was not decided on whether the defendant

litigant, the State cites *McKaskle v. Wiggins*, 465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2d 122, *reh'g denied*, 465 U.S. 1112 (1984); *Brown v. Wainwright*, 665 F.2d 607 (5th Cir. 1982); *People v. Rudd*, 63 Cal. App. 4th 620, 73 Cal. Rptr. 2d 807 (1998), *review denied*, No. S070703 (Cal. Aug. 12, 1998); and *United States v. Montgomery*, 529 F.2d 1404 (10th Cir.), *cert. denied*, 426 U.S. 908 (1976).[13] However, each case is factually distinguishable.

In *Wiggins*, the defendant was charged with and convicted of robbery. 465 U.S. at 170. Wiggins' conviction was set aside, he was retried, and he was convicted again. *Id.* Prior to his first trial, the trial court granted the defendant's request to proceed as a self-represented litigant and appointed two attorneys as standby counsel over the defendant's objection. *Id.* at 170-71. Prior to the defendant's second trial, the defendant sought to rescind his waiver of counsel and was appointed at least two attorneys. *Id.* at 171-72. The defendant subsequently requested to again proceed as a self-represented litigant, and the trial court granted his motion and appointed standby counsel over the defendant's objection. *Id.* at 172. Throughout the second trial, the defendant vacillated between requests that standby counsel "not be allowed to interfere with [the defendant's] presentations to the court" and explicit and implicit requests for assistance from standby counsel.

---

had abandoned or waived his request to proceed as a self-represented litigant. Instead, *Fritz* was decided on the principle that "[t]he right to proceed pro se cannot be used as a means of unjustifiably delaying a scheduled trial or hearing or to obstruct the orderly administration of justice." *Fritz*, 21 Wn. App. at 361. In *Fritz*, the court held that because the defendant used his request to proceed as a self-represented litigant as a delaying tactic, "the trial court did have discretion to deny the defendant's motion to represent himself without the assistance of counsel and did not abuse its discretion in so ruling." *Id.* at 365. Thus, *Fritz* is distinguishable and does not support the State's argument.

[13] We note that with the exception of *Fritz* and *Wiggins*, the State cites no binding precedent in support of its argument. And, as explained in this opinion, both *Fritz* and *Wiggins* are inapplicable to Chhim's case.

*Id.* at 172-73. The defendant eventually filed a petition for federal habeas corpus relief, arguing "that standby counsel's conduct deprived him of his right to present his own defense." *Id.* at 173. The Fifth Circuit agreed and held that the defendant's right to self-representation had been violated by standby counsel's "unsolicited" and "overzealous" participation at trial. *Id.*

The U.S. Supreme Court accepted review and addressed whether "excessive involvement by [standby] counsel . . . destroy[ed] the appearance that the defendant [was] acting pro se." *Id.* at 181 (italics omitted). The Court concluded that while such excessive involvement could conceivably infringe on a defendant's right to self-representation, no such infringement occurred in the defendant's case. *Id.* at 181-83. Rather, the defendant's "pro se efforts were undermined primarily by his own, frequent changes of mind regarding *counsel's role*." *Id.* at 182 (italics omitted and emphasis added). Thus, *Wiggins* does not stand for the proposition that "the right to self-representation may be waived or forfeited through words or conduct . . . indicating that one is vacillating on the issue or has abandoned one's request altogether." Br. of Resp't at 39. Rather, *Wiggins* stands for the proposition that a self-represented defendant's vacillation on what role standby counsel is to play at trial may defeat the defendant's argument that standby counsel infringed on their right to proceed as a self-represented litigant. *Id.* at 181-83. In other words, the defendant in *Wiggins* vacillated over standby counsel's role, *not* over whether he wanted to proceed as a self-represented litigant in the first instance. Thus, *Wiggins* is distinguishable and does not support the State's argument.

*Brown* is similarly distinguishable. In that case, the defendant was appointed counsel to defend against a charge of second degree murder. *Brown*, 665 F.2d at 609. The defendant, unsatisfied with counsel's performance, requested to proceed as a self-represented litigant, and his

counsel filed a "Motion for Leave to Withdraw." *Id.* At a hearing on the motion, the district court doubted the defendant's ability to represent himself and deferred ruling on the motion to give the defendant and counsel time "to see whether the[ir] differences . . . could be worked out." *Id.* "Either at [that] hearing or at some later point, counsel informed the court that he and defendant had resolved their difficulties" and that the defendant "had changed his mind and wanted counsel to continue his representation." *Id.* "The court therefore either denied the motion to withdraw or considered it abandoned." *Id.* The defendant "did not indicate to the court or to counsel either formally or informally that he still desired to represent himself" before trial began. *Id.* at 609-10. It was not "until the third day of trial, after all evidence was in and just before closing arguments" that the defendant renewed his request to proceed as a self-represented litigant, and the district court denied it. *Id.* at 610.

On appeal, the defendant argued that the district court erred "in finding defendant waived his previously-asserted request to conduct his own defense." *Id.* at 611. The Fifth Circuit rejected the defendant's argument, explaining that "[e]ven if defendant requests to represent himself, . . . the right may be waived through defendant's subsequent conduct indicating he is vacillating on the issue or has abandoned his request altogether." *Id.* The defendant waived his right to proceed as a self-represented litigant "through subsequent conduct after an initial request." *Id.* For example, the defendant "concede[d] that at some point after the hearing on the motion to withdraw," but before it was denied, "he asked counsel to continue his representation." *Id.* The court also cited defense "counsel's statement to the court that he and defendant had worked out their differences" and the defendant's tacit agreement as evidence that the defendant waived his request to proceed as a self-represented litigant. *Id.*

Unlike the defendant in *Brown*, Chhim had no chance to vacillate on his request to proceed as a self-represented litigant because the trial court denied Chhim's request. In other words, after Chhim requested to proceed as a self-represented litigant, he did not engage in "subsequent conduct indicating he is vacillating on the issue or has abandoned his request altogether." *Id*.

The State argues that Chhim abandoned his request because he "allowed his appointed counsel to make important arguments on his behalf," such as moving to sever the counts he faced by victim. Br. of Resp't at 41. But that is not the sort of vacillation *Brown* addressed. As shown above, the court in *Brown* took issue with the fact that the defendant acquiesced to and relied on appointed counsel's assistance *after* making his initial request to proceed as a self-represented litigant and *before* the district court denied the request. In contrast, here, Chhim maintained his request to proceed as a self-represented litigant until the trial court denied his request.[14] Thus, Chhim cannot be deemed to have abandoned the request to proceed as a self-represented litigant pursuant to *Brown*.

*Rudd* is similarly unhelpful to the State. There, the defendant requested to proceed as a self-represented litigant "on the 58th day of the 60 days during which the case must be tried." *Rudd*, 73 Cal. Rptr. 2d at 808. The trial court worried the defendant was using his right to self-represent as a delaying tactic, but the defendant assured the trial court he would be ready to proceed

---

[14] Even if we were to construe Chhim's letter seeking substitute counsel as evidence that Chhim vacillated on his request to proceed as a self-represented litigant, both Chhim and defense counsel explained to the court that Chhim sought to substitute himself as counsel. Furthermore, after the trial court addressed the letter and inquired whether Chhim was requesting to represent himself or a new attorney, Chhim stated he wanted to represent himself and withdrew his letter. Thus, to the extent the letter evidences Chhim's abandonment of his request to proceed as a self-represented litigant, he withdrew the letter, renewed his request to proceed as a self-represented litigant, and continued seeking to self-represent until the trial court denied the request.

to trial the following Monday, and the trial court granted the defendant's request. *Id.* However, on Monday, the defendant stated he was not prepared for trial, and the trial court vacated the ruling allowing the defendant to proceed as a self-represented litigant and appointed counsel. *Id.* It was not until the defendant appealed and filed an appellate brief "seven months after [he was] sentenced" that he objected to the trial court's revocation of his self-representation status. *Id.*

On appeal, the court concluded "that defendant has waived his objection raised for the first time on appeal to the . . . order revoking his pro se status" because California law required that "constitutional objections . . . be interposed before the trial judge in order to preserve such contentions for appeal." *Id.* at 811-12. The court explained that the defendant was "not contending that there was any error in connection with the determination to permit him to proceed pro se" and that the defendant "certainly preserved his initial request to proceed in pro se by requesting such." *Id.* at 812. Rather, for the first time on appeal, the defendant challenged the trial court's revocation of his self-representation status and appointment of counsel, and the court reasoned that by failing to object to that order, the defendant abandoned his request to proceed as a self-represented litigant. *Id.* at 812-13.

Chhim, in contrast, was never granted self-representation status, and the trial court cannot have revoked an order it never made. Rather, Chhim maintained his request to proceed as a self-represented litigant until the trial court denied the request, and the State does not explain how Chhim can be deemed to have abandoned a request that had already been denied.

Finally, in *Montgomery*, when the defendant was arraigned, he requested a new attorney with no connections to the government. 529 F.2d at 1405. The trial court denied the defendant's request, so defendant moved to proceed as a self-represented litigant. *Id.* The trial court denied

the defendant's request. *Id.* Appointed counsel subsequently sought a continuance due to ongoing plea bargain negotiations. *Id.* The negotiations resulted in a superseding indictment charging the defendant with a lesser included offense to the two original charges. *Id.* The defendant pleaded guilty to the superseding information and the trial court ordered a presentence investigation. *Id.* at 1405-06. However, "[s]oon after the plea was accepted and the sentence was imposed, appellant filed a pro se notice of appeal and a motion in which he requested that he be allowed to proceed pro se and without counsel." *Id.* at 1406.

On appeal, Montgomery argued that he was denied his constitutional right to self-representation. *Id.* The Tenth Circuit disagreed, noting that Montgomery "allowed [appointed counsel] to conduct plea bargaining on his behalf" and "accepted all of the benefits of the plea bargaining by entering a plea of guilty to the lesser offense." *Id.* In doing so, Montgomery "demonstrated that he was no longer asserting his right to represent himself." *Id.* Ultimately, because the court concluded that Montgomery voluntarily entered a guilty plea, Montgomery was "precluded from asserting that his right to represent himself was infringed." *Id.* at 1407. "The voluntary plea of guilty is the independent intervening act which renders ineffectual the prior failure to allow appellant to represent himself." *Id.* Thus, *Montgomery* turns on the principle "that a plea of guilty constitutes a waiver of prior alleged constitutional violations." *Id.* There was no such guilty plea in Chhim's case.

The State's authorities are distinguishable and not persuasive. Therefore, we hold that Chhim did not waive or abandon his request to proceed as a self-represented litigant.

4.      Waiver of Right to Counsel

Having concluded that Chhim's request to proceed as a self-represented litigant was unequivocal and that he did not abandon it, we address whether Chhim knowingly, voluntarily, and intelligently waived his right to counsel. Chhim argues that the "trial court erred in concluding Mr. Chhim's waiver of counsel was not knowing, intelligent, and voluntary." Br. of Appellant at 40. We agree.

To determine whether a defendant's waiver of his right to counsel is knowing, intelligent, and voluntary, the trial court must engage in an on-the-record colloquy with the defendant. *State v. Burns*, 193 Wn.2d 190, 203, 438 P.3d 1183 (2019). "The colloquy should generally include a discussion of the nature of the charges against the defendant, the maximum penalty, and the fact that the defendant will be subject to the technical and procedural rules of the court in the presentation of his case." *Id.*

Additional, "nonexhaustive factors" the trial court may consider include the defendant's "education, experience with the justice system, mental health, and competency." *Id.* The trial court may also consider "the defendant's behavior, intonation, and willingness to cooperate with the court." *Id.* "So long as the trial court conducted an adequate inquiry into a defendant's request and there is a factual basis for the court's finding that the waiver of counsel was not knowing, intelligent, and voluntary, the trial court's discretionary decision will not be disturbed on appeal." *Id.* at 204.

In terms of legal knowledge, "a defendant need not himself have the skill and experience of a lawyer in order [to] competently and intelligently . . . choose self-representation." *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). Rather, the defendant

"should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S. Ct. 236, 87 L. Ed. 268 (1942), *reh'g denied*, 317 U.S. 605 (1943)). "[T]rial courts cannot deny pro se status simply because a lay person lacks the training and experience of a lawyer," but they "may consider that a defendant's mental capacity will have serious and negative effects on the ability to conduct a defense." *In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 669, 260 P.3d 874 (2011).

Here, the trial court conducted a colloquy on the record to determine whether Chhim was knowingly, intelligently, and voluntarily waiving his right to counsel. During that colloquy, the trial court informed Chhim that he faced two counts of first degree child rape, asked if he understood the charges against him, and Chhim responded, "I understood." VRP (Nov. 10, 2022) at 7. The trial court informed Chhim that he faced a potential life sentence if found guilty at trial and Chhim responded, "I understood; I do." VRP (Nov. 10, 2022) at 7. The trial court informed Chhim that the consequences of a guilty verdict were "serious and potentially catastrophic," and urged Chhim multiple times to accept appointed counsel. VRP (Nov. 10, 2022) at 7. Chhim continued to seek self-representation.

The trial court also asked Chhim whether he realized "that the rules of evidence govern what evidence may or may not be introduced at trial; and in representing yourself, you must abide by those rules?" and Chhim responded, "Yes, I understood." VRP (Nov. 10, 2022) at 8. The trial court asked Chhim whether he acknowledged he would be bound by the rules of criminal procedure and he responded, "Yes, I understood some." VRP (Nov. 10, 2022) at 9. Chhim also

acknowledged that he would "be required to present [his] testimony in a question-and-answer format by asking questions of [him]self." VRP (Nov. 10, 2022) at 9.

Thus, the trial court's initial colloquy with Chhim "include[d] a discussion of the nature of the charges against the defendant, the maximum penalty, and the fact that the defendant will be subject to the technical and procedural rules of the court in the presentation of his case." *Burns*, 193 Wn.2d at 203. And the trial court initially found that Chhim "knowingly and voluntarily waived the right to counsel." VRP (Nov. 10, 2022) at 10-11.

However, after the State urged the trial court to reconsider its ruling, the trial court found that Chhim's waiver was *not* knowing, intelligent, and voluntary. The record shows that in changing its ruling, the trial court abused its discretion because it applied the incorrect legal standard and its decision was not supported by the record. *Madsen*, 168 Wn.2d at 504.

We begin by noting that in its written order denying Chhim's request to proceed as a self-represented litigant, the trial court stated that its decision was made "[a]fter . . . engaging in a detailed colloquy on the record with the Defendant . . . concerning the *Hampton* factors (184 Wn.[2d] (2015))." CP at 29-30. That is an incorrect legal standard.

In *Hampton*, our Supreme Court delineated several factors a trial court can consider when ruling on a continuance related to a defendant's *choice* of counsel. 184 Wn.2d at 664-70. The *Hampton* court did not address any motion to proceed as a self-represented litigant. Thus, the trial court abused its discretion to the extent it relied on the *Hampton* factors in denying Chhim's motion.

The trial court provided several bases for its finding. The first basis articulated by the trial court was that Chhim "fail[ed] to exhibit competency to represent himself in this matter." CP at

41

30. To support this, the trial court stated that Chhim "fail[ed] to demonstrate an understanding of legal procedure." CP at 30. That is an incorrect legal standard. "[T]rial courts cannot deny pro se status simply because a lay person lacks the training and experience of a lawyer." *Rhome*, 172 Wn.2d at 669; *see also Faretta*, 422 U.S. at 835 ("[A] defendant need not himself have the skill and experience of a lawyer in order [to] competently and intelligently . . . choose self-representation."). Rather, the trial court need only ensure that the defendant is aware he "will be subject to the technical and procedural rules of the court in the presentation of his case." *Burns*, 193 Wn.2d at 203. Here, Chhim acknowledged that he would be so bound.

The trial court also found Chhim's waiver of counsel was not knowing, intelligent, or voluntary because Chhim "fail[ed] to demonstrate an understanding of the seriousness of the charges in this matter (two counts of Rape of a Child in the 1st Degree)" and "fail[ed] to comprehend the potential consequences of a guilty verdict although it was explained to him." CP at 30. However, the record shows that Chhim acknowledged that he faced two charges of first degree child rape and acknowledged that he faced a potential life sentence if convicted. There is no record that Chhim expressed confusion or a lack of understanding of the seriousness of the charges or the consequences he would face if he was found guilty. Thus, the trial court's finding that Chhim did not understand the seriousness of the charges against him and the potential consequences of a guilty verdict is not supported by the record.[15]

---

[15] The State argues that "Chhim's history of noncompliance with court orders showed he did not understand the consequences of self representation." Br. of Resp't at 37. While the State is correct that Chhim failed to comply with two court orders, both instances of noncompliance occurred several months before Chhim sought to represent himself, and the record shows that Chhim complied with the trial court's orders for the remainder of both trials.

The trial court also denied Chhim's motion, in part, because "[a]lthough [Chhim] has repeatedly stated that no one can represent him as well as he can represent himself, there is no legitimate cause for dissatisfaction with Defendant's assigned counsel." CP at 30. This is an incorrect legal standard. *See State v. Sabon*, 24 Wn. App. 2d 246, 257, 519 P.3d 600 (2022) ("The judge appeared fixated on [the defendant] providing a satisfactory answer to the question of why he wanted to proceed pro se, but self-representation is a right and a simple desire to exercise that right is a legally sufficient reason."). Chhim's desire to proceed as a self-represented litigant was a legally sufficient reason to assert his right to do so. Therefore, to the extent the trial court denied Chhim's motion because he had "no legitimate cause for dissatisfaction with [his] assigned counsel," the trial court applied an incorrect legal standard. CP at 30.

Next, the trial court denied Chhim's motion because allowing Chhim to proceed as a self-represented litigant would "disrupt and delay trial proceedings in this serious matter involving a child victim." CP at 30. This is an incorrect legal standard. "[A] criminal defendant's right to pro se status cannot be denied simply because affording the right will be a burden on the efficient administration of justice." *Madsen*, 168 Wn.2d at 509.

Finally, the trial court's finding that Chhim "fail[ed] to exhibit competency to represent himself in this matter" could be interpreted as a finding that Chhim lacked the mental capacity to self-represent. CP at 30. The record does not support any such finding.

As stated above, a trial court "may consider that a defendant's mental capacity will have serious and negative effects on the ability to conduct a defense." *Rhome*, 172 Wn.2d at 669. However, Chhim underwent a competency evaluation prior to filing his motion to proceed as a self-represented litigant, and the evaluation "indicate[d] that Mr. Chhim does not have a

43

documented history of functional impairment related to substance use, and he does not appear to warrant a psychiatric diagnosis at this time." VRP (Oct. 12, 2022) at 9. Moreover, based on the competency evaluation, the trial court found that Chhim had "the capacity to understand the nature of the proceedings against him[] and to assist in his[] defense." CP at 18. Based on the competency evaluation, the trial court concluded that Chhim was competent to stand trial. Thus, contrary to the what the trial court may have implied, Chhim had already exhibited that he was competent to stand trial and able to assist in his own defense. Thus, to the extent the trial court denied Chhim's motion to proceed pro se based on his perceived mental incompetence, the trial court abused its discretion.

Thus, each of the trial court's bases for finding Chhim's waiver of his right to counsel were either not supported by the record or were the result of applying an incorrect legal standard. Therefore, the trial court abused its discretion when it found Chhim's waiver was not knowing, intelligent, and voluntary.

Because Chhim made an unequivocal request to represent himself, and he knowingly, intelligently, and voluntarily waived his right to counsel, the trial court abused its discretion when it denied Chhim's request to proceed as a self-represented litigant. Accordingly, we reverse Chhim's convictions and remand for further proceedings. *Madsen*, 168 Wn.2d at 510; *Sabon*, 24 Wn. App. 2d at 251.

B. JUROR MISCONDUCT

Chhim argues that the trial court erred when it denied his motion for a new trial based on juror misconduct after his second trial. We agree.

CrR 7.5(a)(1) allows a trial court to grant a defendant's motion for a new trial if it "affirmatively appears that a substantial right of the defendant was materially affected" by the jury's receipt of "any evidence, paper, document or book not allowed by the court." To warrant a new trial, the defendant must have "'been so prejudiced that nothing short of a new trial can insure that the defendant will be treated fairly.'" *State v. Pete*, 152 Wn.2d 546, 552, 98 P.3d 803 (2004) (internal quotation marks omitted) (quoting *State v. Bourgeois*, 133 Wn.2d 389, 406, 945 P.2d 1120 (1997)). We review the denial of a motion for a new trial for an abuse of discretion. *Id.*

"'Novel or extrinsic evidence is defined as information that is *outside all the evidence* admitted at trial, either orally or by document.'" *Id.* (emphasis in original) (internal quotation marks omitted) (quoting *State v. Balisok*, 123 Wn.2d 114, 118, 866 P.2d 631 (1994)). "When a jury hears extrinsic information and where that extrinsic information *inheres in the verdict*, the trial court must make an objective inquiry, asking whether the evidence could have affected the jury's verdict." *State v. Gaines*, 194 Wn. App. 892, 898, 380 P.3d 540, *review denied*, 186 Wn.2d 1028 (2016) (emphasis in original). "After a jury renders a verdict, it is improper for the trial court to ask jurors about their subjective reasoning—thus, the trial court may not ask whether the extrinsic evidence subjectively influenced the jury's verdict, and it must instead apply the objective test." *Id.*

Here, Juror Number 3 discovered juror notes from Chhim's first trial just after deliberations began in the second trial and informed the trial court's judicial assistant. However, because the judicial assistant failed to promptly bring the matter to the trial court's attention, the jury reached

45

a verdict before all the jurors could be questioned.[16]  Thus, because a verdict had already been reached, when the jurors were questioned, the trial court was required to apply an objective test to determine whether the notes from Chhim's first trial "could have affected the jury verdict," and was not permitted to determine "whether the extrinsic evidence subjectively influenced the jury's verdict." *Gaines*, 194 Wn. App. at 898.

But when the trial court allowed the parties to question the jurors post-verdict, almost every juror who saw the notes was asked whether the notes influenced their deliberations.  It appears that based on the jurors' responses, the trial court denied Chhim's motion for a new trial.  The trial court ruled that there was "no evidence that the jury considered the notes or were influenced by the notes even though almost all the jurors stated that they may have briefly held on to them or briefly glanced at them."  CP at 259.  This was error.

"After a jury renders a verdict, it is improper for a trial court to ask jurors about their subjective reasoning." *Gaines*, 194 Wn. App. at 898.  Instead, the trial court was required to focus its inquiry on whether the juror notes from the first trial objectively *could* have affected the jury's verdict in the second trial.  *Id.*  And here, when an objective test is applied, they could have.  The top of the first 3 pages of the juror notes from the first trial contained information about another

---

[16] That the judicial assistant did not immediately bring this matter to the judge's attention is inexcusable.  The record shows that the judicial assistant had each juror review the juror notes from the first trial in an attempt to determine if the notes belonged to any juror from the second trial, and the judicial assistant failed to promptly bring the matter to the trial judge's attention.  Instead, the judicial assistant put the juror notes on their desk for the remainder of the court day and failed to raise the matter with the judge until the next morning.  In the meantime, the jury was allowed to continue deliberations, and sufficient time elapsed such that the jury informed the trial court that it had reached a verdict the next morning before the judge could determine what to do about the previous day's discovery of the juror notes from the first trial by Juror Number 3.  The record shows a complete failure of proper courtroom management.

"victim" that was "sexually assa[u]lted," included Chhim's address, and stated the victim was "[m]olested 4 times orally when 6 y/o." Ex. 28, at 1, 3. Also included in the juror notes from the first trial, among other information, was a variation of Chhim's name, his physical description, color of his house, and a statement that the "[v]ictim said incident occured [sic] 8 years prior when she was either in kindergarten or 1st grade." Ex. 28, at 2.

Undisputedly, the juror notes clearly contained Chhim's home address—2002 East 60th Street. The address was relevant at both trials as it was where Chhim abused C.A. and C.L. Juror Number 3 made the connection, telling the trial court that he recognized the address on the juror notes as the same one at issue in Chhim's second trial. Juror Number 2 heard Juror Number 3 announce that he "thought that the address was the same" to the other jurors. 6 VRP (Sep. 14, 2023) at 866. Juror Number 5 recalled that another juror speculated that the notes were "from a different case." 6 VRP (Sep. 14, 2023) at 870. Juror Number 8 heard Juror Number 3 mention "that the address looked the same." 6 VRP (Sep. 14, 2023) at 878. Juror Number 9 "overheard a comment about the address written at the top being the same as one of the addresses mentioned during the proceedings." 6 VRP (Sep. 14, 2023) at 881. Juror Number 9 recalled a juror speculating "like, if this was like maybe a second go around or something." 6 VRP (Sep. 14, 2023) at 881. Juror Number 10 stated that the jury speculated that the notes might be from "another trial." 6 VRP (Sep. 14, 2023) at 885. Juror Number 10 also recalled Juror Number 3 "thinking maybe it might have been a mistrial." 6 VRP (Sep. 14, 2023) at 885. Juror Number 11 recalled Juror Number 3 stating that "he had recognized" the address as an address that had been mentioned at trial. 6 VRP (Sep. 14, 2023) at 889. Juror Number 12 speculated that the notes were "maybe . . . from . . . another case or something." 6 VRP (Sep. 14, 2023) at 891.

Clearly, the juror notes from Chhim's first trial "could have affected the jury's verdict" by suggesting, as some jurors expressed, that Chhim had already been tried but there was a mistrial and Chhim was now being retried or that Chhim had been tried in a different trial. *Gaines*, 194 Wn. App. at 898. Either scenario could have influenced the jury to find Chhim guilty, either because they did not want to see him escape justice after a mistrial or because they wanted to punish him for other crimes, regardless of the evidence concerning the crimes before them.

The trial court abused its discretion by denying Chhim's motion for a new trial based on the erroneous application of a subjective test. When an objective inquiry is made by asking whether the evidence could have affected the jury's verdict, the record requires the conclusion that the juror notes from the first trial discovered by Juror Number 3 in Chhim's second trial could have affected the jury's verdict. *Id*. Thus, the trial court erred when it denied Chhim's motion for a new trial, and we reverse his attempted child molestation conviction and remand for a new trial. *Pete*, 152 Wn.2d at 555.

CONCLUSION

The trial court erred when it denied Chhim's motion to proceed as a self-represented litigant and when it denied Chhim's motion for a new trial after the second trial. Therefore, we reverse Chhim's convictions and remand for new trials on both charges.

Lee, J.

We concur:

Veljacic, A.C.J.

Che, J.